T.C. Memo. 2018-96

UNITED STATES TAX COURT

ENDEAVOR PARTNERS FUND, LLC, DELTA CURRENCY TRADING, LLC,
TAX MATTERS PARTNER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8698-12, 8710-12,     Filed June 28, 2018.
8721-12, 8846-12,
9975-12, 11290-12,
12591-12.

_____

[1]The following cases are consolidated herewith: Cabrini Partners Fund,
LLC, Delta Currency Trading, LLC, Tax Matters Partner, docket No. 8710-12;
Alligator Partners Fund, LLC, Delta Currency Trading, LLC, Tax Matters Partner,
docket No. 8721-12; Satellite Partners Fund, LLC, Delta Currency Trading, LLC,
Tax Matters Partner, docket No. 8846-12; Counterpoint Capital, LLC, Caballo,
Inc., Tax Matters Partner, docket No. 9975-12; Bricolage Capital, LLC, Caballo,
Inc., Tax Matters Partner, docket No. 11290-12; and Delta Currency Trading,
LLC, Caballo, Inc., Tax Matters Partner, docket No. 12591-12.

**[*2]** <u>Elias M. Zuckerman</u>, <u>David L. Katsky</u>, <u>Adrienne B. Koch</u>, and <u>Joseph B. Weiner</u>, for petitioners.

<u>Steven N. Balahtsis</u>, <u>Michael A. Sienkiewicz</u>, <u>Lisa M. Goldberg</u>, and <u>Irene Y. Kim</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LAUBER, <u>Judge</u>:  These consolidated TEFRA cases involve petitions for readjustment of partnership items set forth in timely notices of final partnership administrative adjustment (FPAAs) issued to petitioners for fiscal and calendar tax years that span 2001 and 2002.  The parties resolved before trial all adjustments relating to Delta Currency Trading, LLC (Delta), Bricolage Capital, LLC (Bricolage), and Counterpoint Capital, LLC (Counterpoint).  We must decide whether certain transactions entered into by the remaining partnerships--Alligator Partners Fund, LLC (Alligator), Cabrini Partners Fund, LLC (Cabrini), Endeavor Partners Fund, LLC (Endeavor), and Satellite Partners Fund, LLC (Satellite)--had a reasonable ex ante profit potential or nontax business purpose.

All of the transactions at issue involved paired foreign-currency options. The Internal Revenue Service (IRS or respondent) challenged these transactions

[*3] on various grounds, including their alleged lack of economic substance. Disallowing all of the claimed loss deductions, the IRS made adjustments to the partnerships' income that exceed $300 million in the aggregate.

Finding that the transactions lacked any economic substance whatsoever, we will sustain respondent's disallowance of the loss deductions in question. But we are unable to sustain the accuracy-related penalties determined under section 6662(a).[2] Although the partnerships' conduct is plainly deserving of penalty, respondent has conceded that the IRS did not secure, prior to the issuance of the FPAAs, written supervisory approval of the penalties as required by section 6751(b)(1). See Simonsen v. Commissioner, 150 T.C. __, __ (slip op. at 9) (Mar. 14, 2018); Graev v. Commissioner, 149 T.C. __, __ (slip op. at 14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). The penalties are therefore not appropriate.

FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. Alligator, Cabrini,

_____

[2]All statutory references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar. We express all exchange rates to four decimal places, rounding the final digit. All times refer to the local time in New York, New York.

**[\*4]** Endeavor, and Satellite ceased operations in 2002, and none had a principal place of business when their tax matters partner petitioned this Court.  Absent stipulation to the contrary, appeal of these cases would apparently lie to the U.S. Court of Appeals for the D.C. Circuit.  <u>See</u> sec. 7482(b) (penultimate sentence).

A.     <u>Bricolage and Affiliates</u>

Andrew D. Beer met Samyak Veera while attending Harvard Business School in the 1990s.  After graduating, they worked at various financial firms but reunited at Sentinel Advisors (Sentinel), a New York hedge fund specializing in financial transactions euphemistically described as "tax-advantaged."  During the dot-com boom, newly minted millionaires created a seemingly insatiable demand for such schemes, which were promoted by accounting firms, blessed by law firms, and engineered by finance professionals.

Sensing that they could profit in such an environment, Messrs. Beer and Veera left Sentinel in 1999 to found Bricolage, a Delaware limited liability company (LLC).  Initially, Mr. Beer held a 60% interest in Bricolage, and Mr. Veera held 40%.  Later, Mr. Beer contributed his interest in Bricolage to Caballo, his wholly owned S corporation, and Mr. Veera contributed his interest in Bricolage to StillWaters, Inc. (StillWaters), his wholly owned S corporation.

**[*5]** Messrs. Beer and Veera, by virtue of their work at Sentinel, became familiar with the Code provisions relating to partnerships and financial instruments. Bricolage's business model exploited perceived "quirks" in those provisions using highly leveraged option contracts. In order to facilitate the transactions in which it specialized, Bricolage created Delta, Counterpoint, Delta Currency Management Co. LLC (DCMC), and Bricolage Capital Management Co. LLC (BCMC). Caballo and StillWaters respectively held 60% and 40% ownership interests in each entity.

The principal transactions at issue in these cases were executed by Alligator, Cabrini, Endeavor, and Satellite. Those entities were "roll funds," so called because they were designed to roll forward into future years tax-shelter losses that investors had been unable to use previously. (As we explain later, the roll funds, after fulfilling that function, were repurposed to generate tax-shelter losses for Mr. Beer personally and his Bricolage affiliates.) It is thus useful to understand how those alleged prior-year losses arose.

Bricolage's first business opportunity appeared in 1999 when Integrated Capital Associates (ICA), a merchant banking firm, asked it to design option trades for a transaction called Currency Option Investment Strategy (COINS), a

[*6] variant of the Son-of-Boss tax shelter.[3] Bricolage agreed. During the ensuing months, it developed close relationships with ICA, Deutsche Bank AG, and Arthur Andersen (then an accounting firm).

Clients participating in COINS were usually steered to this strategy by Arthur Andersen. COINS involved the purchase of offsetting call options (also called straddle positions) denominated in foreign currencies. The options were contributed to an LLC that elected to be treated as a partnership, which assumed the participant's obligations under the options. The participant increased his basis in his partnership interest by the cost of the contributed options but did not reduce his basis when the partnership assumed his obligations under the options. The participant ultimately disposed of his partnership interest and claimed a corresponding loss deduction.

Bricolage's compensation for its role in COINS and subsequent deals was computed as a percentage of the tax losses produced by the transaction. (It labeled this compensation a "strategic consulting fee.") COINS generated approximately

---

[3]Son-of-Boss tax shelters were variations on a predecessor known as "BOSS, an acronym for 'bond and options sales strategy.'" Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007). Son-of-Boss schemes came in many flavors, but the essential elements included a series of prearranged transactions designed to generate an artificially high basis in a partnership interest. Participants then disposed of their partnership interests, generating artificial losses used to offset participants' real income. Ibid.

[*7] $5 million in revenue for Bricolage in 1999. As its reputation and experience grew, Bricolage began developing trades for other tax-shelter schemes, including a transaction similar to COINS designed by BDO Seidman, another accounting firm.

B.   POPS

In late 1999 Bricolage, ICA, and Arthur Andersen turned their attention to a new scheme called Partnership Option Portfolio Securities (POPS). POPS was designed to generate gains in one tax period and offsetting losses in another.[4] First, an accommodating party affiliated with Bricolage would acquire a 99% interest in an LLC that elected to be treated as a partnership (this LLC was referred to as an upper tier partnership). The accommodating party was usually an offshore (or otherwise tax indifferent) entity affiliated with ICA. Bricolage or an affiliate retained a 1% interest in the upper tier partnership.

The upper tier partnership acquired a 99% interest in a partnership (the latter entity was referred to as the lower tier partnership). Delta held a 1% interest in the lower tier partnership. The lower tier partnership entered into offsetting option contracts with Deutsche Bank. Each option contract purported to be a foreign

---

[4]Mr. Beer testified that POPS was designed to exploit the straddle rules in section 988. He believed that these rules were designed to prevent a taxpayer from closing the loss leg of a straddle and deferring the gain leg to a subsequent tax period. POPS accordingly switched the order of these events: investors closed the gain leg first and kept the loss leg open until the losses were needed.

**[*8]** currency contract under section 1256(g)(2)(A) and typically covered a "minor" currency, such as the Greek drachma or Danish krone. One leg of the straddle went "long" on the currency (i.e., would profit if the currency appreciated), and the other leg went "short" (i.e., would lose value if the currency appreciated). Any fluctuation in the value of the currency produced a gain in one option and an offsetting loss in the other.

The lower tier partnership terminated whichever option profited, but kept the losing option open. It would then enter into successor hedge positions (called "switch positions") in order to preserve the amount of unrealized loss.[5] The gain on the option was allocated pro rata to the upper tier partnership, increasing the basis of each partnership interest.

Next, the accommodating party sold its interest in the upper tier partnership to the POPS investor. The accommodating party thus incurred a loss to offset the gain allocated to it by the lower tier partnership. The POPS investor then purchased the upper tier partnership's interest in the lower tier partnership at its fair market value. The upper tier partnership realized a loss on the sale, but the loss deduction was disallowed because the POPS investor was a majority owner of the

---

[5] Under Bricolage's reading of the section 1256 straddle rules, the partnership would realize a loss on the sister option if and only if it took delivery of the underlying foreign currency.

**[*9]** upper tier partnership. See sec. 707(b)(1)(A). If the POPS investor wanted an ordinary loss, the lower tier partnership terminated the loss leg of the straddle and allocated the loss pro rata to its owners. If the POPS investor wanted a capital loss, a Bricolage affiliate purchased the investor's interest in the lower tier partnership.

For the POPS strategy and subsequent deals, Bricolage received most of its legal advice from Arnold & Porter, a law firm. Arnold & Porter coordinated Bricolage's regulatory filings and prepared legal documents, including LLC agreements, for participants in Bricolage-designed transactions. It also took an active role in advising about the structure of these transactions. Its most significant function, however, was to write opinion letters for investors in the transactions. Each letter stated that the form of the transactions, if challenged by the IRS, would more likely than not be respected. Bricolage initially engaged Arnold & Porter on an hourly basis. But Bricolage eventually settled on a flat-rate fee structure under which it paid the firm $50,000 for each opinion letter. Bricolage paid Arnold & Porter about $10 million in legal fees between 1999 and 2004.

C.    PICO

In early 2000 Bricolage developed a new scheme called Personal Investment Corp. (PICO). PICO was promoted by Ernst & Young, an accounting firm.

[*10] PICO, like POPS, featured LLCs, a tiered structure, straddles, and a transitory partner. However, the LLCs in the PICO structure elected to be treated as S corporations rather than partnerships. This feature meant that the transitory partner (accommodating party) had to be an individual who was not a nonresident alien. See sec. 1361(b)(1)(C). Because Bricolage could no longer use offshore corporations as accommodating parties as it had done in POPS, it enlisted Jason J. Chai and Andrew S. Ahn for this purpose when constructing the PICO transactions.

Mr. Chai is an architect based in Los Angeles. He is related to Mr. Beer's wife and regularly visited the Beers' home in New York during Bricolage's first months in business. Mr. Beer suggested that Mr. Chai participate in PICO, assuring him that the strategy had been vetted by attorneys and tax professionals. As an accommodating party, Mr. Chai would be allocated multi-million-dollar gains in certain PICO transactions, but Mr. Beer assured him that offsetting losses would be created to wipe out the gains. Mr. Chai believed Mr. Beer's representations and joined Counterpoint in 2000. He received a $1.2 million signing bonus and an annual salary of $100,000.

Despite his generous compensation, Mr. Chai had a limited role in Bricolage. He gave some architectural advice about office design, but his primary du-

[*11] ties were to sign loan agreements, articles of incorporation, and other documents used in PICO transactions. At first he traveled from Los Angeles to New York to execute such documents. But as the demand for Bricolage's products expanded, these cross-country trips became onerous. In 2001 Bricolage accordingly formed JJC Trading, LLC (JJC), a disregarded entity owned by Mr. Chai. Mr. Chai executed a power of attorney authorizing Bricolage to act on JJC's behalf.

Mr. Ahn joined Bricolage in 2000 as a portfolio manager and was initially tasked with facilitating trades for POPS and COINS transactions. After several months, Mr. Veera approached him about participating in PICO deals as an accommodating party. Mr. Veera explained that the transactions would generate large gains that would be allocated to a single-member LLC owned by Mr. Ahn. But when the income flowed to Mr. Ahn's personal tax return, he would allegedly be able to "defease" the gains by electing, pursuant to section 475, to mark his holdings to their (very low) market value.

Mr. Ahn understood that his proposed role in PICO entailed considerable financial risk and that the gains allocated to him would total hundreds of millions of dollars. But he decided that the compensation promised by Mr. Veera outweighed the risk. (Mr. Ahn testified that he was paid $3 million when he left

**[\*12]** Bricolage in 2002.) To implement Mr. Ahn's role as an accommodating party, Bricolage formed ASA Trading, LLC (ASA), a disregarded entity wholly owned by him. Bricolage also formed Amarillo PFI Corp. (Amarillo), an LLC that elected to be treated as an S corporation. Amarillo was owned 50%-50% by JJC and ASA, the respective eponymous entities of Messrs. Chai and Ahn.

Bricolage executed the first PICO transactions in 2000. PICO bore many similarities to POPS. The PICO investor initially held a 1% interest in an upper tier S corporation in which JJC or ASA held a 99% interest. The upper tier S cor- poration held a 99% interest in a lower tier S corporation; Bricolage or an affiliate owned the remaining 1%. The lower tier S corporation entered into offsetting foreign-currency option contracts. By design, one option generated an immediate gain and the other generated a deferred loss. The lower tier partnership closed the gain leg of the straddle, realizing a gain that was ultimately allocated 99% to JJC or ASA. (That gain flowed through to Mr. Chai's or Mr. Ahn's individual return but was eliminated by making a section 475 election and marking the contracts to market.) The upper tier S corporation then redeemed JJC's or ASA's interest, making the PICO investor its sole shareholder. The lower tier S corporation eventually terminated the loss leg of the straddle, handing the PICO investor the desired losses at the desired time.

**[\*13]** During early 2000 Bricolage earned revenue of $14 million from COINS transactions and a similar strategy promoted by BDO Seidman. But in September 2000 the IRS announced its intention to challenge purported losses from transactions (like COINS) that relied on artificially high bases. See Notice 2000-44, 2000-36 I.R.B. 255. Foreseeing a reduction in demand for these products, Bricolage redoubled its efforts on POPS and PICO transactions.

D.    The Roll Funds

POPS generated $37 million in fees for Bricolage and its affiliates in 2000 and many multiples of that in purported losses for Bricolage's clients. But these transactions often generated larger losses than the clients could currently use. Bricolage accordingly created "roll funds" that purported to transfer the clients' unneeded losses into subsequent tax periods.[6]

Each of the roll funds--Alligator, Cabrini, Endeavor, and Satellite--was incorporated as a Delaware LLC and elected to be treated as a partnership for Federal tax purposes.[7] At no point did the roll funds elect to adjust their bases in part-

---

[6]Mr. Beer testified that most POPS transactions were designed to produce at least $50 million of losses. Many clients did not need losses of that magnitude in 2000 but anticipated future income that they wished to shelter.

[7]As explained infra pp. 37-38, each partnership was terminated in late 2001 and replaced by a new partnership pursuant to section 708. For the sake of

(continued...)

[*14] nership property under section 754. Delta was the managing partner for each roll fund, which executed with Delta a currency management and securities trading authorization agreement. This agreement authorized Delta to manage each roll fund's financial accounts and to trade on its behalf. Each roll fund maintained dollar-denominated books. Despite engaging in numerous transactions denominated in foreign currencies, none of the roll funds ever recorded a single dollar of foreign currency gain or loss on its books.

### 1.    Alligator

Bricolage executed a POPS transaction for Gary Heiman in 2000, generating a purported loss of $54,572,817. Mr. Heiman believed that he would be unable to use the entire loss that year. Bricolage accordingly created Alligator on July 20, 2000, as a roll fund for Mr. Heiman.

The members of Alligator were Atlantic Partners Fund, LLC (Atlantic), the upper tier partnership used to effectuate the POPS transaction, and Delta. Atlantic held a 99% ownership interest in Alligator, which it purchased for $300,000; Counterpoint held the remaining 1% ownership interest, which it purchased for $3,030. These purchase prices were keyed to the size of the tax loss the client de-

---

[7](...continued)
simplicity, we will describe each partnership as if it were continuous.

[*15] sired for 2001 (in Mr. Heiman's case, roughly $30 million). Atlantic was owned by Mr. Heiman, who had a 99% ownership interest, and Bricolage, which had a 1% interest.

## 2. Cabrini

Bricolage executed a POPS transaction for the Ronald Family Trust A (Ronald Trust) in 2000, generating a purported loss of $52,022,389. The Ronald Trust believed that it would be unable to use the entire loss that year. Bricolage accordingly created Cabrini on November 30, 2000, as a roll fund for the Ronald Trust.

The members of Cabrini were Gonzaga Partners Fund, LLC (Gonzaga), the upper tier partnership used to effectuate the POPS transaction, and Delta. Gonzaga held a 99% ownership interest in Cabrini, which it purchased for $150,000; Delta held the remaining 1% ownership interest, which it purchased for $1,515. These purchase prices were keyed to the size of the tax loss the client desired for 2001 (in the Ronald Trust's case, roughly $15 million). Gonzaga was owned by the Ronald Trust, which had a 99% ownership interest, and Bricolage, which had a 1% interest.

## 3. Endeavor

Bricolage executed a POPS transaction for the Roberts family in 2000, generating a purported loss of $103,851,955. The Roberts family believed that it

[*16] would be unable to use the entire loss that year. Bricolage accordingly created Endeavor on July 10, 2000, as a roll fund for the Roberts family.

The members of Endeavor were Everglade Partners Fund, LLC (Everglade), the upper tier partnership used to effectuate the POPS transaction, and Delta. Everglade held a 99% ownership interest in Endeavor, which it purchased for $500,000; Delta held the remaining 1% ownership interest, which it purchased for $5,051. These purchase prices were keyed to the size of the tax loss the client desired for 2001 (in the Roberts family's case, roughly $50 million). Everglade was owned by the Roberts family, which had a 99% ownership interest, and Bricolage, which had a 1% interest.

### 4. Satellite

Bricolage executed a POPS transaction for Ira Lubert in 2000, generating a purported loss of $43,499,541. Mr. Lubert believed that he would be unable to use the entire loss that year. Bricolage accordingly created Satellite on November 15, 2000, as a roll fund for Mr. Lubert.

The members of Satellite were Scabbard Partners Fund, LLC (Scabbard), the upper tier partnership used to effectuate the POPS transaction, and Delta. Scabbard held a 99% ownership interest in Satellite, which it purchased for $180,000; Delta held the remaining 1% ownership interest, which it purchased for

[*17] $1,818. These purchase prices were keyed to the size of the tax loss the client desired for 2001 (in Mr. Lubert's case, about $18 million). Scabbard was owned by Mr. Lubert, who had a 99% ownership interest, and Bricolage, which had a 1% interest.

E.     Roll Fund Transactions in 2000

The first set of transactions at issue occurred on December 14 and 21, 2000. Each trade was memorialized by an International Swaps and Derivatives Association (ISDA) Master Agreement executed with Deutsche Bank. None of the roll funds received legal or tax advice, orally or in writing, about these transactions.[8]

1.     Opening Transactions

On December 14, 2000, Delta executed a series of trades on behalf of Alligator, Endeavor, and Satellite. Each partnership purchased from Deutsche Bank three sets of paired options (i.e., each partnership purchased a total of six options). The premium and payout amounts for one option in each pair were denominated in euro; the premium and payout amounts for the other option in each pair were de-

---

[8]Mr. Beer testified that the roll funds did not seek legal advice regarding these transactions because Bricolage had procured opinion letters for the preceding POPS transactions entered into by the investors. Bricolage apparently believed that securing separate opinion letters for the roll fund transactions was unnecessary since these transactions (in Mr. Beer's view) were substantially similar to the preceding deals.

[*18] nominated in Greek drachmas.  Before executing the December 14 trades, Bricolage and Deutsche Bank stipulated that the payouts on the options would be converted to dollars according to preagreed rates, which ensured that the payouts on each option would be equivalent in dollar terms.  Because the exchange rates at which the options would be settled were known in advance, the parties eliminated any foreign-exchange risk that might otherwise have existed.

Each partnership paid for each option a small amount of cash (0.25% of the option premium).  The remaining 99.75% of the purchase price was funded by Deutsche Bank by a currency swap, which functioned in effect as a loan.  For each option, Deutsche Bank advanced to the partnership on December 14 sufficient currency (in euro or drachmas, as necessary) to cover 99.75% of the option purchase price.  The partnership agreed to repay Deutsche Bank a slightly larger amount of each currency seven days later, when the options expired.  The difference between the former and latter sums was nominal (roughly 0.1% of the option premium) and was equivalent to interest.

The payouts on each of the three option pairs were triggered by a different target exchange rate.  The payouts on one pair were triggered by the Czech koruna/euro exchange rate.  The payouts on the second pair were triggered by the

[*19] Polish zloty/euro exchange rate. The payouts on the third pair were triggered by the Hungarian forint/euro exchange rate.

Each option was binary, meaning that it would produce one of two specified payouts. The first option in each pair provided that if, at 10 a.m. on December 21, 2000, the target exchange rate equaled or exceeded the specified trigger rate, Deutsche Bank would immediately issue to the roll fund a payment equal to 199.7% of the option premium. On the other hand, if the target exchange rate at that moment was below the specified trigger rate, the option would produce a payout equal to about 0.5% of the option premium. In the latter case, Deutsche Bank would not issue the payment immediately, but would retain this smaller sum and pay it (with interest thereon) to the roll fund in June 2001.

The second option in each pair exactly reversed the payout conditions. If at 10 a.m. on December 21, 2000, the target exchange rate was below the specified trigger rate, Deutsche Bank would immediately issue to the roll fund a payment equal to 199.7% of the option premium. On the other hand, if the target exchange rate at that moment equaled or exceeded the specified trigger rate, the option would produce a payout equal to about 0.5% of the option premium. In the latter case, Deutsche Bank would not issue the payment immediately, but would retain this smaller sum and pay it (with interest thereon) to the roll fund in June 2001.

[*20] On December 21, 2000, Delta, on behalf of Alligator, Cabrini, Endeavor, and Satellite, executed a second series of option trades. Delta and Deutsche Bank again agreed that the payouts on the options would be converted to dollars according to preagreed exchange rates. Because the exchange rates at which the options would be settled were known in advance, the parties eliminated any foreign-exchange risk that might otherwise have existed. These trades involved the purchase of six sets of paired options that were substantially identical to the December 14 options in terms of notional currencies and triggering exchange rates. The only difference was that all dates were moved back about one week: The expiration and big payout date for each option was December 27, 2000; and the small payout for each losing option was due in June 2001.

### 2. Results of the 2000 Trades

The December 14 options settled on December 21, and the December 21 options settled on December 27. Each option pair generated, for tax year 2000, a gain (representing the big payout less the premium for the winning option) and an interest expense (representing the cost of the currency swap). Alligator's trades generated ordinary income of $30,521,134 and an interest expense of $65,179. Cabrini's trades generated ordinary income of $15,258,245 and an interest expense of $29,770. Endeavor's trades generated ordinary income of $50,868,569 and an

[*21] interest expense of $108,645. And Satellite's trades generated ordinary income of $18,312,282 and an interest expense of $39,106. Each roll fund allocated its respective income and interest expense pro rata to its respective upper tier partnership and Delta. The upper tier partnership, in turn, allocated the gain and interest deduction pro rata to the POPS investor and Bricolage. The gains allocated to the POPS investors were completely offset by purported losses they had realized in 2000 but were otherwise unable to use.

On June 6, 2001, the roll funds and Deutsche Bank agreed to extend the payout date for the loss legs of the December 2000 option pairs by six months (i.e., from June to December 2001). But the roll funds terminated the loss legs a month early on November 21, 2001. On that date, Alligator, Cabrini, Endeavor, and Satellite recorded ordinary losses of $30,454,206, $15,228,782, $50,757,008, and $18,272,126, respectively. As noted earlier, these losses matched the losses the POPS investors desired for 2001 and formed the basis for calculating the purchase prices for their respective partnership interests. See supra pp. 14-17.

These losses represented the difference, calculated in dollars, between the premium price for the losing option and the small payouts the roll funds received. The roll funds also recorded interest income, representing interest paid by Deutsche Bank on the small payouts. The losses and interest income were allocated

[*22] pro rata to each partnership's respective members. The effect of allocating 99% of these losses to the POPS investors was to roll forward to 2001 a portion of the tax-shelter losses they had been unable to use in 2000.

F.     Roll Fund Transactions in 2001

By mid-2001 the roll funds had served their original purpose of rolling forward the POPS investors' losses. In late 2001 Bricolage repurposed Alligator, Cabrini, Endeavor, and Satellite to generate losses for Bricolage and its principals, chiefly Mr. Beer. To that end, the roll funds executed a series of transactions on November 26, December 7, and December 18, 2001. Each trade was memorialized by an ISDA Master Agreement executed with Deutsche Bank. None of the roll funds received legal or tax advice, orally or in writing, about these trades.

The 2001 transactions were all structured as block trades. Although each participating partnership secured individual loans and purchased individual options, the loans and options differed only in magnitude (keyed to the magnitude of the desired tax losses). For the sake of readability and brevity, we describe each block trade as a single transaction.

1.     November 26 Trades

On November 26, 2001, Delta, on behalf of 11 Bricolage funds, entered into two block trades with Deutsche Bank. For each block trade Delta secured loans

**[*23]** from Deutsche Bank and used the loan proceeds to purchase foreign currency options from Deutsche Bank.  Alligator, Endeavor, Cabrini, and two other Bricolage funds participated in the first block trade (block trade A).  Satellite and five other Bricolage funds participated in the second block trade (block trade B).

Before executing the November 26 block trades, Delta and Deutsche Bank exchanged trade summary spreadsheets detailing the amounts involved in each set of options and the results that each transaction could produce.  All the options involved puts and calls on the euro (symbolized by €) and the Danish krone (symbolized by DKK).  At all relevant times, the krone was pegged to the euro, and the prices of the currencies correlated almost perfectly.[9]

All of the options expired seven days from the date of purchase.  The trade summary spreadsheets included the seven-day forward rate, prevailing on the date the trades were opened, for converting kroner to euro.[10]  That rate was €1.0000 = DKK 7.4411.  The trade summary spreadsheets also included the seven-day for-

---

[9]For the 2001 trades Bricolage apparently switched to the krone from the drachma because it desired a currency that was pegged to the euro, and the drachma was no longer available because Greece had entered the Eurozone.

[10]A forward rate is the rate at which one currency can be exchanged for another at a future date.  A spot rate is the rate at which currencies can currently be exchanged.  In most instances, the spot rate will differ from the forward rate.  This divergence is attributable (among other things) to differences in the interest rates prevailing in the various countries.

**[*24]** ward rates, prevailing on the date the trades were opened, for converting kroner and euro into dollars. Those rates were €1.0000 = $0.8803 and $1.0000 = DKK 8.4524. Delta and Deutsche Bank used these seven-day forward rates, rather than the spot rates prevailing on the date the trades were closed, to calculate the payouts on the options.[11] Because the exchange rates at which the options would be settled were known in advance, the parties eliminated any meaningful foreign-exchange risk that might otherwise have attended these transactions.

    a. <u>Block Trade A</u>

Delta allocated block trade A to the roll funds as follows: 20.1% to Alligator, 30.9% to Endeavor, and 14.8% to Cabrini. (The balance was allocated to other Bricolage funds not involved here.) Block trade A included a put and a call, and payment on each was triggered by the exchange rate between the euro and the British pound. Delta purchased a €47,693,350 call and a DKK 354,849,300 put. The cost of each option, when converted into dollars at the November 26 spot rate, was $41,994,000.

---

[11]There are small discrepancies--usually of a few thousand dollars--between the payouts recorded in the roll funds' ledgers and the payouts that one would expect from calculating the payouts using the seven-day forward rates. We attribute those discrepancies to rounding. The rates shown on the spreadsheets were computed to only four decimal places, whereas the actual exchange rates were apparently stated more precisely.

**[*25]** The participating partnerships made a trivial cash payment toward the purchase price of each option--$209,970 or 0.5% of the purchase price. The remaining 99.5% was funded by Deutsche Bank through loans. Deutsche Bank loaned the roll funds €47,454,889 (then worth $41,784,030) to purchase the call option and DKK 353,075,053 (also worth $41,784,030) to purchase the put option. Both loans were to be repaid in seven days when the options expired.

Both options were binary options. The euro call provided that if, at 10 a.m. on December 3, 2001, the euro/pound exchange rate was greater than or equal to .6233 (the trigger rate), Deutsche Bank would pay the roll funds, within two days, €94,971,417 (or $83,602,183 at the stipulated forward rate). This big payout approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($41,784,030 × 2 = $83,568,060) plus one week's interest. On the other hand, if the euro/pound exchange rate at that moment was below the trigger rate, the option would produce a small payout of €477,299 (or $420,160 at the stipulated forward rate). The small payout approximated the cash the partnerships had paid toward the options ($209,970 × 2 = $419,940) plus one week's interest. In the latter case, Deutsche Bank would not issue the payment immediately, but would retain the small payout on the losing option and remit it (with interest thereon) to the roll fund in December 2003.

[*26] The krone put exactly reversed the payout conditions. If at 10 a.m. on December 3, 2001, the euro/pound exchange rate was below the trigger rate, Deutsche Bank would pay the roll funds within two days DKK 706,643,039 (or $83,602,184 at the stipulated forward rate). Once again, this big payout approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($41,784,030 × 2 = $83,568,060) plus one week's interest. On the other hand, if the euro/pound exchange rate at that moment was equal to or above the trigger rate, the option would produce a small payout of DKK 3,551,384 (or $420,160 at the stipulated forward rate). Once again, the small payout approximated the cash the partnerships had paid toward the options ($209,970 × 2 = $419,940) plus one week's interest. In the latter case, Deutsche Bank would not issue the payment immediately, but would retain the small payout on the losing option and remit it (with interest thereon) to the roll fund in December 2003.

b. Block Trade B

Delta allocated 3.8% of block trade B to Satellite and the balance to other Bricolage funds not involved here. Block trade B resembled block trade A, except that it involved a euro put and a krone call. The terms and structure of the two options were identical except for the currency amounts involved. The purchase price for each option was $41,593,000; the partnerships paid $207,965 (or 0.5%)

[*27] in cash toward each purchase price; and Deutsche Bank loaned the partnerships $41,385,035 (in euro and kroner, respectively) to fund 99.5% of each purchase price.

For the call option, the big payout was DKK 699,895,317 ($82,803,868 at the stipulated forward rate), and the small payout was DKK 3,517,472 ($416,148 at the stipulated forward rate). For the put option, the big payout was €94,064,537 ($82,803,868 at the stipulated forward rate), and the small payout was €472,741 ($416,148 at the stipulated forward rate). Once again, the big payout on the winning option approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($41,385,035 × 2 = $82,770,070) plus one week's interest. And the small payout on the losing option approximated the cash the partnerships had paid toward the options ($207,965 × 2 = $415,930) plus one week's interest. As for block trade A, Deutsche Bank would make the big payout on the winning option within two days, but it would retain the small payout on the losing option until December 2003, when it would pay that sum with interest to the roll fund.

c. Results of the November 26 Trades

The euro/pound exchange rate on December 3 exceeded .6233. On December 5 Deutsche Bank accordingly converted its obligations under the option contracts into dollars at the prearranged seven-day forward rates. For block trade A,

[*28] Deutsche Bank made the big payout of $83,602,183 on the winning euro call option, which it used to pay itself back for the two loans plus interest. That trade generated a small payment of $420,160 on the losing krone put option, which Deutsche Bank retained and ultimately remitted (with interest) to the roll funds in October 2002.[12] For block trade B, Deutsche Bank made the big payout of $82,803,868 on the winning krone call option, which it used to pay itself back for the two loans plus interest. That trade generated a small payment of $416,148 on the losing euro put option, which Deutsche Bank retained and ultimately remitted (with interest) to the roll funds in October 2002.

Delta allocated to Alligator, Cabrini, Endeavor, and Satellite for 2001 their respective shares of the option gains and interest expense, and it allocated to them for 2002 their respective shares of the option losses and interest income. For 2001 the partnerships recorded ordinary income of $8,366,916, $6,160,192, $12,845,794, and $1,598,041, respectively. The losses on the losing options were rolled forward to 2002.

---

[12]The residual payments were initially due in December 2003, but the roll funds and Deutsche Bank agreed that they would be remitted early when Bricolage began to wind down its operations. See infra p. 40.

[*29] 2.     December 7 Trades

On December 7, 2001, Delta, on behalf of 13 Bricolage funds, executed a second set of block trades with Deutsche Bank.  Alligator, Endeavor, Cabrini, and two other Bricolage funds participated in the first block trade (block trade C).  Satellite and six other Bricolage funds participated in the second block trade (block trade D).

Like the November 26 trades, the December 7 trades involved puts and calls on the euro and the Danish krone, this time with payment triggered by the euro/yen exchange rate on December 14, 2001.  Trade summary spreadsheets exchanged between Delta and Deutsche Bank included the seven-day forward rates, prevailing on the date the trades were opened, for converting kroner into euro and for converting kroner and euro into dollars.  Those rates were €1.0000 = DKK 7.4457; $1.0000 = DKK 8.3778; and €1.0000 = $0.8887.  Delta and Deutsche Bank used those seven-day forward rates, rather than the spot rates prevailing on the date the trades were closed, to calculate the payouts on the options.  Because the exchange rates at which the options would be settled were known in advance, the parties eliminated any meaningful foreign-exchange risk that might otherwise have attended these transactions.

[*30]     a. Block Trade C

Delta allocated 27.8% of block trade C to Alligator, 24.1% to Endeavor, 11.0% to Cabrini, and the balance to funds not involved here. Block trade C, like block trade A, involved a euro call and a krone put, and the material terms of the transactions (apart from the amounts involved) were substantially identical. The purchase price for each option was $54 million; the partnerships paid $135,000 (or 0.25%) in cash toward each purchase price; and Deutsche Bank loaned the partnerships $53,865,000 (in euro and kroner, respectively) to fund 99.75% of each purchase price.

For the call option, the big payout was €121,258,388 (or $107,767,915 at the stipulated forward rate), and the small payout was €303,904 (or $270,095 at the stipulated forward rate). For the put option, the big payout was DKK 902,852,773 (or $107,767,915 at the stipulated forward rate), and the small payout was DKK 2,262,788 (or $270,095 at the stipulated forward rate). Once again, the big payout approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($53,865,000 × 2 = $107,730,000) plus one week's interest. And the small payout approximated the cash the partnerships had paid toward the options ($135,000 × 2 = $270,000) plus one week's interest. Deutsche Bank would make the big payout on the winning option within four days, but it would retain

[*31] the small payout on the losing option until December 2003, when it would pay that sum with interest to the roll fund.

### b. Block Trade D

Delta allocated 10.4% of block trade D to Satellite and the balance to funds not involved here. Block trade D, like block trade B, involved a euro put and a krone call, but with payment now triggered by the euro/yen exchange rate. The material terms of the transactions (apart from the amounts involved) were substantially identical. The purchase price for each option was $54,375,000; the partnerships paid $135,937 (or 0.25%) in cash toward each purchase price; and Deutsche Bank loaned the partnerships $54,239,063 (in euro and kroner, respectively) to fund 99.75% of each purchase price.

For the call option, the big payout was DKK 909,122,584 (or $108,516,304 at the stipulated forward rate), and the small payout was DKK 2,278,504 (or $271,971 at the stipulated forward rate). For the put option, the big payout was €122,100,460 (or $108,516,304 at the stipulated forward rate), and the small payout was €306,015 (or $271,971 at the stipulated forward rate). Once again, the big payout approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($54,239,063 × 2 = $108,478,126) plus one week's interest. And the small payout approximated the cash the partnerships had paid toward the options

**[\*32]** ($135,937 × 2 = $271,874) plus one week's interest. Deutsche Bank would make the big payout on the winning option within four days, but it would retain the small payout on the losing option until December 2003, when it would pay that sum with interest to the roll fund.

### c. Results of the December 7 Trades

The euro/yen exchange rate on December 14 exceeded the specified trigger rate. On December 18 Deutsche Bank accordingly converted its obligations under the option contracts into dollars at the prearranged seven-day forward rates. For block trade C, Deutsche Bank paid $107,767,915 on the winning euro call option, which it used to pay itself back for the two loans plus interest. That trade generated a payment of $270,095 on the losing krone put option, which Deutsche Bank retained and ultimately remitted with interest to the roll funds in October 2002. For block trade D, Deutsche Bank made the big payout of $108,516,304 on the winning krone call option, which it used to pay itself back for the two loans plus interest. That trade generated a payout of $271,971 on the losing euro put option, which Deutsche Bank retained and ultimately remitted with interest to the roll funds in October 2002.

Delta allocated to Alligator, Cabrini, Endeavor, and Satellite for 2001 their respective shares of the option gains and interest expense, and it allocated to them

[*33] for 2002 their shares of the option losses and interest income. For 2001 the partnerships recorded ordinary income of $14,944,726, $5,898,185, $12,952,095, and $5,659,069, respectively. The losses on the losing options were rolled forward.

### 3.  December 18 Trades

On December 18, 2001, Delta, on behalf of 13 Bricolage funds, executed its final set of binary option trades with Deutsche Bank. Alligator, Endeavor, Cabrini, and four other Bricolage funds participated in the first block trade (block trade E). Satellite, Cabrini, and five other Bricolage funds participated in the second block trade (block trade F).

Like the previous 2001 trades, the December 18 trades involved puts and calls on the euro and the Danish krone, this time with payment triggered by the euro/Swiss franc exchange rate on December 26, 2001. Trade summary spreadsheets exchanged between Delta and Deutsche Bank included the seven-day forward rates, prevailing on the date the trades were opened, for converting kroner into euro and for converting kroner and euro into dollars.[13] Those rates were €1.0000 = DKK 7.4415; $1.0000 = DKK 8.2482; and €1.0000 = $0.9022. Delta

---

[13]Because seven days from December 18 was Christmas Day, the option contracts expired on December 26, and the seven-day forward rates were applicable on that day.

**[*34]** and Deutsche Bank used those seven-day forward rates, rather than the spot rates prevailing on the date the trades were closed, to calculate the payouts on the options. Because the exchange rates at which the options would be settled were known in advance, the parties eliminated any meaningful foreign-exchange risk that might otherwise have attended these transactions.

### a. Block Trade E

Delta allocated 32.1% of block trade E to Alligator, 27.8% to Endeavor, and the balance to funds not involved here. Block trade E, like block trades A and C, involved a euro call and a krone put, and the material terms of the transactions (apart from the amounts involved) were substantially identical. The purchase price for each option was $93,410,000; the partnerships paid $233,525 (or 0.25%) in cash toward each purchase price; and Deutsche Bank loaned the partnerships $93,176,475 (in euro and kroner, respectively) to fund 99.75% of each purchase price.

For the call option, the big payout was €206,638,062 (or $186,427,079 at the stipulated forward rate), and the small payout was €517,890 (or $467,236 at the stipulated forward rate). For the put option, the big payout was DKK 1,537,692,185 (or $186,427,079 at the stipulated forward rate), and the small pay-out was DKK 3,853,865 (or $467,236 at the stipulated forward rate). Once again,

[*35] the big payout approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($93,176,475 × 2 = $186,352,950) plus one week's interest. And the small payout approximated the cash the partnerships had paid toward the options ($233,525 × 2 = $467,050) plus one week's interest. Deutsche Bank would make the big payout on the winning option within two days, but it would retain the small payout on the losing option until December 2003, when it would pay that sum with interest to the roll fund.

### b. Block Trade F

Delta allocated 12.3% of block trade F to Satellite, 10.0% to Cabrini, and the balance to funds not involved here. Like block trades B and D, block trade F involved a euro put and a krone call, but with payment now triggered by the euro/Swiss franc exchange rate. The material terms of the transactions (apart from the amounts involved) were substantially identical. The purchase price for each option was $92,260,000; the partnerships paid $230,470 (or 0.25%) in cash toward each purchase price; and Deutsche Bank loaned the partnerships $92,029,350 (in euro and kroner, respectively) to fund 99.75% of each purchase price.

For the call option, the big payout was DKK 1,518,761,170 (or $184,131,914 at the stipulated forward rate), and the small payout was DKK 3,806,419 (or $461,483 at the stipulated forward rate). For the put option, the big

**[*36]** payout was €204,094,076 (or $184,131,914 at the stipulated forward rate), and the small payout was €511,514 (or $461,483 at the stipulated forward rate). Once again, the big payout approximated the sum of the two loans Deutsche Bank had extended to the roll funds ($92,029,350 × 2 = $184,058,700) plus one week's interest. And the small payout approximated the cash the partnerships had paid toward the options ($230,470 × 2 = $460,940) plus one week's interest. Deutsche Bank would make the big payout on the winning option within two days, but it would retain the small payout on the losing option until December 2003, when it would pay that sum with interest to the roll fund.

### c. Results of the December 18 Trades

The euro/Swiss franc exchange rate on December 26 exceeded the specified trigger rate. On December 28 Deutsche Bank accordingly converted its obligations under the option contracts into dollars at the prearranged seven-day forward rates. For block trade E, Deutsche Bank made the big payout of $186,427,079 on the winning euro call option (which it used to pay itself back for the two loans plus interest). That trade generated a payment of $467,236 on the losing krone put option, which Deutsche Bank retained and ultimately remitted with interest to the roll funds in October 2002. For block trade F, Deutsche Bank made the big payout of $184,131,914 on the winning krone call option, which it used to pay itself

[*37] back for the two loans plus interest. That trade generated a payout of $461,483 on the losing euro put option, which Deutsche Bank retained and remitted with interest to the roll funds in October 2002.

Delta allocated to Alligator, Cabrini, Endeavor, and Satellite for 2001 their respective shares of the option gains and interest expense, and it allocated to them for 2002 their respective shares of the option losses and interest income. For 2001 the partnerships recorded ordinary income of $29,985,189, $9,218,033, $25,909,164, and $11,320,741, respectively. The losses on the losing options were rolled forward.

G.      Technical Terminations of Atlantic, Satellite, and Cabrini

On December 6, 2001, Atlantic sold its 99% interest in Alligator to Black Fox Partners Fund, LLC (Black Fox), a Bricolage affiliate held by Amarillo (99%) and DCMC (1%). Under section 708(b)(1)(B), this sale terminated Alligator's tax year.[14] The same day, Scabbard sold its 99% interest in Satellite to Black Fox, thus terminating Satellite's tax year.

---

[14]This section provides that a partnership is considered terminated if at least 50% of the total interest in its capital and profits is sold or exchanged in a 12-month period. (This is sometimes referred to as a "technical" termination.) By regulation, the sale of the interest terminates the existing partnership and creates a new one. Sec. 1.708-1(b)(4), Income Tax Regs. The terminated partnership is treated as if it had contributed its assets and liabilities in exchange for an interest in the new partnership. Ibid.

**[\*38]** Alligator and Satellite each filed a Form 1065, U.S. Return of Partnership Income, for the tax year ending (TYE) December 6, 2001. See secs. 443(a)(2), 6031(a); sec. 1.6031(a)-1(a)(1), Income Tax Regs. On its Form 1065 Alligator reported an ordinary loss of $22,087,290, representing $30,454,206 of purported losses from the 2000 trades offset against gain of $8,366,916 from the November 26, 2001, trades. On its Form 1065 Satellite reported an ordinary loss of $16,674,085, representing purported losses of $18,272,126 from the 2000 trades offset against gain of $1,598,041 from the November 26, 2001, trades. Alligator and Satellite allocated 99% of these losses to Atlantic and Scabbard, respectively, and 1% to Delta.

On December 17, 2001, Gonzaga sold its 99% interest in Cabrini to Black Fox for $143,376, resulting in the termination of Cabrini's tax year. Cabrini accordingly filed a Form 1065 for the tax year ending on that date. On its Form 1065 Cabrini reported an ordinary loss of $3,170,406, representing purported losses of $15,228,782 from the 2000 trades offset against gain of $12,058,377 from the November 26 and December 7, 2001, trades. Cabrini allocated 99% of these losses to Gonzaga and 1% to Delta.

**[\*39]** H.      The Roll Funds' Returns for TYE December 31, 2001

Alligator, Cabrini, Endeavor, and Satellite each filed a timely Form 1065 for TYE December 31, 2001.  On their Forms 1065 Alligator and Satellite reported gains of $44,839,914 and $16,979,810, respectively, on the winning options from the December 7 and 18, 2001, trades.  On its Form 1065 Cabrini reported a gain of $9,218,033 on the winning option from the December 18, 2001, trade.  On its Form 1065 Endeavor reported gains of $51,707,053 on the winning options from the November 26, December 7, and December 18, 2001, trades.  Each roll fund computed its gains as the difference between its share of the large payout (in dollars) and its share of the associated option purchase price (in dollars).   Each roll fund allocated 1% of the gain to Delta and 99% of the gain to Black Fox.[15]

Black Fox allocated 99% of its gain (or $120,302,188) to Amarillo.  Amarillo allocated 50% of that gain to JJC and 50% to ASA.  The income allocated to JJC and ASA flowed through to the 2001 individual returns of Messrs. Chai and Ahn, respectively.

Messrs. Chai and Ahn elected, under section 475(f), to be treated as traders in securities with respect to their interests in Amarillo and reported losses equal to

---

[15]Black Fox acquired Everglade's interest in Endeavor on November 23, 2001.

[*40] the difference between their claimed bases in their Amarillo stock and the stock's fair market value at the time of the elections. Each of Mr. Chai and Mr. Ahn claimed that his Amarillo stock had a basis of $60,632,400 but a fair market value of only $578,005. Each accordingly reported a mark-to-market loss of $60,054,395 ($60,632,400 – $578,005), which offset all but $10,004 of the gain allocated to him by the partnerships.

I.    Reporting Losses From the 2001 Trades

In early 2002 the IRS identified as abusive several transactions involving tiered structures, straddle transactions, and transient partners. The IRS began issuing "soft letters" to participants in such transactions requesting (among other things) the names of investors. Bricolage received its first soft letter in May 2002. Soon thereafter the IRS published notices announcing its intention to challenge the transactions. Notice 2002-65, 2002-41 I.R.B. 690; Notice 2002-50, 2002-28 I.R.B. 98.

Recognizing that the IRS notices accurately described POPS and PICO, Bricolage advised its clients that the notices were only a statement of the IRS' position, not a change in law. But the notices effectively eliminated demand for Bricolage products, forcing it to abandon many planned transactions. Bricolage accordingly began to wind down its activities.

**[\*41]**  On October 9, 2002, Alligator, Cabrini, Endeavor, and Satellite terminated early the open loss legs of the November and December 2001 trades, which were originally scheduled to close in December 2003.  Bricolage canceled all four partnerships, and each timely filed a final Form 1065.  Endeavor's final tax year ended on October 24, 2002, and the final tax years for Alligator, Cabrini, and Satellite ended on November 4, 2002.

On its final Form 1065 each roll fund reported losses from the 2001 trades calculated as the difference between the purchase price (in dollars) for each losing option and that option's deferred small payout (in dollars).  The reported losses were:

| Trade | Alligator | Cabrini | Endeavor | Satellite |
|-------|-----------|---------|----------|-----------|
| 11/26/01 | $8,341,718 | $6,141,639 | $12,807,106 | $1,593,317 |
| 12/7/01 | 14,913,574 | 5,885,891 | 12,925,098 | 5,647,453 |
| 12/18/01 | 29,830,005 | 9,197,860 | 25,852,671 | 11,295,966 |
| Total | 53,085,297 | 21,225,390 | 51,584,875 | 18,536,736 |

J.    FPAAs

On November 10, 2011, respondent issued timely FPAAs to each roll fund.  Alligator and Satellite received FPAAs for their TYEs December 6, 2001, December 31, 2001, and November 4, 2002.  Cabrini received FPAAs for its TYEs December 17 and 31, 2001, and November 4, 2002.  And Endeavor received

[*42] FPAAs for its TYEs December 31, 2001, and October 24, 2002.[16] The FPAAs disallowed deductions for the losses and expenses attributable to the 2000 and 2001 foreign currency trades, determining that these transactions lacked economic substance, that they violated the subchapter K antiabuse provisions, and that the roll fund partnerships were shams. The IRS also asserted partnershiplevel accuracy-related penalties under section 6662. Delta, as tax matters partner for each roll fund, timely petitioned the Court. Because of various changes in the partnership ownership structures during 2001 and 2002, Mr. Beer is the real party in interest for most of the tax liabilities at issue.[17]

K.      Expert Testimony at Trial

        1.      Don M. Chance

Petitioners offered the expert testimony of Don M. Chance, a finance professor at Louisiana State University. Dr. Chance holds a Ph.D. in finance and has

---

[16]Endeavor's tax year ending December 31, 2001, began on November 24, 2001. Accordingly, its liability for the 2000 trades, the loss legs of which closed on November 21, 2001, is not at issue here.

[17]On December 31, 2001, Delta sold its 1% interests in Alligator, Cabrini, Endeavor, and Satellite to the Anova Capital Corp., a Bricolage affiliate. On January 1, 2002, Mr. Beer acquired JJC's and ASA's interests in Amarillo (which owned a 99% interest in Black Fox). Accordingly, most of the losses from the 2001 transactions will flow through to Mr. Beer.

**[*43]** written extensively on foreign currencies and financial markets. The Court

recognized Dr. Chance as an expert in finance and derivatives.[18]

Dr. Chance examined the block trades that occurred in 2001 (denominated

in kroner and euro). He performed a statistical technique called a "Monte Carlo"

simulation to estimate the likelihood that the transactions would be profitable. Al-

though the krone was pegged to the euro, it could fluctuate around the euro within

an extremely narrow band. There was also a theoretical possibility that Denmark

could lift the krone's peg to the euro. Dr. Chance did not estimate the likelihood

that a "depeg" might occur or calculate how such an event would affect the trans-

actions' profit potential.

Dr. Chance's simulations relied on a computer algorithm that generated

25,000 theoretical exchange rates that might have prevailed on the settlement date

for each set of currency options. In performing these simulations, Dr. Chance as-

---

[18]Dr. Chance has previously testified for taxpayers in several tax-shelter cases. Two cases in which he testified involved Son-of-Boss tax shelters; he also testified in a case involving a "Currency Options Bring Reward Alternatives" (COBRA) tax shelter. See Markell Co., Inc. v. Commissioner, T.C. Memo. 2014-86, 107 T.C.M. (CCH) 1447; Woods v. United States, 794 F. Supp. 2d 710 (W.D. Tex. 2010); Bemont Invs., LLC v. United States, 2010 U.S. Dist. LEXIS 77582 (E.D. Tex. 2010), aff'd in part, rev'd in part, 679 F.3d 339 (5th Cir. 2012). In each case Dr. Chance testified that the tax-shelter transactions had a "probability of profit." In each case the court held, contrary to Dr. Chance's testimony, that the transactions lacked economic substance and were purely tax-motivated.

[*44] sumed that the trades would be settled at whatever the spot rates might happen to be on that date. That assumption was contrary to the facts established at trial. As we have found, Delta and Deutsche Bank agreed in advance that the option payouts would be calculated using the seven-day forward rates for the euro/krone, dollar/krone, and dollar/euro that prevailed when they entered into the option contracts. Because the exchange rates at which the options would be settled were agreed in advance, neither party bore any meaningful foreign-exchange risk. Dr. Chance's entire analysis was premised on a contrary-to-fact assumption, and his report and testimony thus have no probative value.

### 2. Jack E. Yeager

Petitioners offered the expert testimony of Jack E. Yeager, a managing partner at the De Laval Yeager Group, who holds a Ph.D. in finance from Texas Tech University. His expert report purports to show that Mr. Beer's decisions to sell tax shelters and repurpose the losses they generated for his personal use were economically rational (i.e., profit-maximizing). Dr. Yeager performed a cashflow analysis that assumed Mr. Beer would purchase the partnerships and sell their built-in losses to investors (or, if he was unable to do so, use the built-in losses himself). Dr. Yeager assumed that Bricolage would be able to sell $500 million of tax shelter losses in 2003, 2004, and 2005. He supplied no basis for that assumption,

**[*45]** and the evidence at trial supplied no basis for it either. Nor did he factor into his analysis the likelihood that the IRS would challenge the tax shelter transactions, thus diminishing or eliminating the demand for such products.

Respondent moved to exclude Dr. Yeager's reports from evidence, and we reserved ruling on that motion. Expert testimony must be "based upon sufficient facts or data" and be relevant to a "fact in issue." Fed. R. Evid. 702. Conversely, "unreasonable, unreliable, and irrelevant expert testimony" should be excluded. See Boltar, LLC v. Commissioner, 136 T.C. 326, 335 (2011). Dr. Yeager's reports relied on many assumptions that had no support in the evidentiary record and are implausible on their face. In any event, his conclusion that Mr. Beer engaged in profit-maximizing behavior is irrelevant to the central issue before the Court, viz, whether the foreign-currency option transactions had any potential for economic profit. We will accordingly grant respondent's motion and exclude Mr. Yeager's reports from evidence.[19]

---

[19]Respondent submitted the rebuttal report of John D. Finnerty in response to Dr. Yeager's report. Dr. Finnerty is the managing director of AlixPartners, LLP, a consulting firm, and received a Ph.D. in operations research from the Naval Postgraduate School. The Court recognized Dr. Finnerty as an expert in financial economics. Dr. Finnerty made many of the same points that have persuaded us to exclude Dr. Yeager's report from evidence.

[*46] 3.    Timothy M. Weithers

Respondent offered the expert testimony of Timothy M. Weithers, a director at the Chicago Trading Co.  Dr. Weithers received a Ph.D. in economics from the University of Chicago and has spent most of his career teaching traders and finance professionals about foreign exchange, options, and derivatives.  The Court recognized Dr. Weithers as an expert in those subjects.  We found him to be a knowledgeable and credible witness.

Dr. Weithers assumed (correctly) that Deutsche Bank had calculated the option payouts using exchange rates to which it and Delta had agreed in advance.  These pre-agreed rates eliminated any meaningful exchange-rate uncertainty or risk that might otherwise have attended the transactions.  Dr. Weithers opined that the transactions would produce the same payouts regardless of what spot prices prevailed for the relevant currencies on the settlement dates, i.e., a big payout in dollars approximating the principal amount of the Deutsche Bank loans and a small payout in dollars approximating the cash contributions by the partnerships.  In Dr. Weithers' view, the transactions amounted to cash deposits by the partnerships that were returned, with interest, when the loss legs closed.  For these reasons, he concluded that the options could not produce an economic profit.

**[*47]** L.     Amended Pleadings

After post-trial briefing, petitioners moved to amend their pleadings to allege that respondent had failed, as part of his burden of production under section 7491(c), to demonstrate that the initial determination of the accuracy-related penalties had been approved, in writing, by the immediate supervisor of the individual who made the determination.[20]  See sec. 6751(b)(1); Chai v. Commissioner, 851 F.3d 190 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42.  We granted that motion and invited respondent to file a motion to reopen the record for the purpose of submitting evidence on this point.

Respondent declined to file such a motion, conceding that he "d[id] not have the written approval of either the immediate supervisor of the individual who made the initial determination to assert an accuracy-related penalty * * * [or of ] a higher level official designated by the Secretary."  However, in post-trial amendments to his answers, respondent reasserted the accuracy-related penalties and alleged that those amendments had been approved, in writing, by the trial attorney's immediate supervisor.

---

[20]Petitioners' motion and respondent's response thereto were filed before this Court issued its Opinion in Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. __ (May 7, 2018), in which we held that the Commissioner does not bear the burden of production on penalties in TEFRA partnership-level proceedings.

**[*48]**                                                  OPINION

A.      Jurisdiction

Section 6226(f) grants this Court jurisdiction to "determine all partnership

items * * * for the partnership taxable year" to which an FPAA relates, including

the proper allocation of such items among the partners and the applicability of any

penalty that "relates to an adjustment to a partnership item." A "partnership item"

means an "item required to be taken into account for the partnership's taxable

year" that the Secretary has determined "is more appropriately determined at the

partnership level than at the partner level." Sec. 6231(a)(3); sec. 301.6231(a)(3)-

1, Proced. & Admin. Regs. Neither party contends that respondent's proposed

adjustments should be determined at the partner level, and we reach the same

conclusion. We accordingly have jurisdiction to review the FPAAs at issue.

B.      Burden of Proof

The IRS' determinations in a notice of deficiency or an FPAA are generally

presumed correct, and taxpayers bear the burden of proving them erroneous. See

Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Republic Plaza Props.

P'ship v. Commissioner, 107 T.C. 94, 104 (1996). Under section 7491(a), the bur-

den of proof may shift to the Commissioner if the taxpayer produces credible evi-

dence with respect to any relevant factual issue and meets other requirements. Pe-

[*49] titioners contend that they maintained all required records, presented credible evidence at trial, and cooperated with respondent and hence that respondent should bear the burden of proof. See sec. 7491(a). Because we base all of our conclusions on a preponderance of the evidence, the allocation of the burden of proof in these cases is immaterial. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008); Kimberlin v. Commissioner, 128 T.C. 163, 171 n.4 (2007).

C.    Analysis

Respondent disallowed deductions for the losses arising from the roll fund transactions on various grounds, including the transactions' alleged lack of economic substance. Respondent alternatively contended that the roll fund partnerships were shams and that the transactions violated subchapter K's antiabuse provisions. Finding as we do that the paired foreign currency transactions had no economic substance, we need not address those alternative arguments.

"The fundamental premise underlying the Internal Revenue Code is that taxation is based upon a transaction's substance rather than its form." Freytag v. Commissioner, 904 F.2d 1011, 1015 (5th Cir. 1990), aff'g 89 T.C. 849 (1987), aff'd, 501 U.S. 868 (1991). Even if a taxpayer scrupulously follows the Code's formalities, he can derive tax benefits from a transaction only if it is "compelled or encouraged by business or regulatory realities, * * * imbued with tax-independent

**[\*50]** considerations, and \* \* \* not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). Whether a transaction has economic substance requires a factual determination. United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 456 (1950).

Congress codified the "economic substance" doctrine in 2010. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, sec. 1409, 124 Stat. at 1067-1070 (codified at section 7701(o)). For prior years, including the tax years at issue here, the Federal courts applied these principles as a matter of common law, examining the objective economic effects of a disputed transaction and the taxpayer's subjective purpose for entering into it. But the courts did not entirely agree on the relationship between these factors.

Some courts applied a conjunctive test under which a transaction would be respected only if it had objective economic effects other than tax savings and a nontax business purpose. See Cemco Inv'rs, LLC v. United States, 515 F.3d 749 (7th Cir. 2008); Coltec Indus. v. United States, 454 F.3d 1340 (Fed. Cir. 2006); United Parcel Serv. of Am., Inc. v. Commissioner, 254 F.3d 1014 (11th Cir. 2001), rev'g T.C. Memo 1999-268; Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989). Other courts employed a disjunctive test, requiring either an objective

**[\*51]** potential for profit <u>or</u> a nontax business purpose. <u>See</u> <u>IES Indus., Inc. v. United States</u>, 253 F.3d 350, 353-354 (8th Cir. 2001]; <u>Horn v. Commissioner</u>, 968 F.2d 1229, 1237 (D.C. Cir. 1992), <u>rev'g</u> <u>Fox v. Commissioner</u>, T.C. Memo. 1988-570, 56 T.C.M. (CCH) 863; <u>Rice's Toyota World, Inc. v. Commissioner</u>, 752 F.2d 89, 91 (4th Cir. 1985), <u>aff'g in part, rev'g in part</u> 81 T.C. 184 (1983). A third group of courts took a more flexible approach, examining various factors deemed relevant to a determination concerning economic substance. <u>See, e.g.</u>, <u>Reddam v. Commissioner</u>, 755 F.3d 1051, 1060 (9th Cir. 2014) (stating that "the economic substance doctrine is not a rigid two-step analysis, but instead focuses holistically on whether the transaction had any practical economic effects" other than creation of tax benefits), <u>aff'g</u> T.C. Memo. 2012-106; <u>ACM P'ship v. Commissioner</u>, 157 F.3d 231, 248 (3d Cir. 1998), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1997-115.

Appeal of the instant cases would apparently lie to the Court of Appeals for the D.C. Circuit. <u>See</u> <u>supra</u> p. 3-4.[21] That court has applied a disjunctive test under which a transaction will be respected if it "ha[d] a reasonable prospect, <u>ex ante</u>, for economic gain" or was "undertaken for a business purpose other than the

_____

[21]We are generally reluctant to opine on potential venues for appeal. <u>See</u> <u>CNT Investors, LLC v. Commissioner</u>, 144 T.C. 161, 183 (2015). But we must do so where the applicable law is "squarely in point." <u>Golsen v. Commissioner</u>, 54 T.C. 742, 757 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971); <u>Lardas v. Commissioner</u>, 99 T.C. 490, 494-495 (1992).

[*52] tax benefits." Horn, 968 F.2d at 1237. If a transaction satisfies either prong of this test, it is deemed to have economic substance. See Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251, 98 T.C.M. (CCH) 410, 416 (citing Horn, 968 F.2d at 1239).

### 1. Objective Profit Potential

We must first determine whether the paired foreign currency options, in an objective sense, had any "reasonable possibility of profit." Horn, 968 F.2d at 1237. Depending on the type of transaction involved, factors relevant to this inquiry may include whether the transaction: (1) could generate a profit, IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.), 301 F.3d 96, 103 (3d Cir. 2002); (2) created genuine obligations enforceable by an unrelated party, United Parcel Serv. of Am., Inc., 254 F.3d at 1018; or (3) imposed upon the taxpayer a real risk of loss, IES Indus., Inc., 253 F.3d at 354. A transaction will not be respected for tax purposes unless it is capable ex ante of appreciably affecting the taxpayer's beneficial interest in a manner other than reducing his tax. See Knetsch v. United States, 364 U.S. 361, 366 (1960).

The paired foreign currency options were complicated, and intentionally so. Stripped to their essentials, however, they were remarkably simple and vapid. For each option pair, the roll fund was guaranteed to get the big payout on the winning

**[*53]** option and the small deferred payout on the losing option.  The big payout roughly equaled the sum of the two option premiums, and it was used to repay the Deutsche Bank loan, which had funded the two option premiums.  Once the big payout is offset against the loan, the transaction appears in its true economic form: The roll funds made a modest deposit of cash and got their money back, in the form of the small deferred  payout, one year later with interest.

The paired foreign currency options were substantially identical apart from the amounts involved.  Block trade A, executed on November 26, 2001, illustrates the absence of any profit potential.  These paired options involved bets on what the exchange rate would be, seven days later, between the euro and the British pound:  Would that rate be above or below the "trigger rate" of 0.6233?

The roll funds borrowed $83,568,060 from Deutsche Bank, using those funds and $419,940 of their own cash to purchase a put option and a call option, each for a premium of $41,994,000.  On its face, each option was tremendously risky:  In one week, it would roughly double in value or become almost worthless.  But that risk--and the correlative potential for profit--was completely eliminated by the offsetting option, which precisely reversed the payout conditions.  The roll funds were guaranteed to win the big payout on one option and get the losing de-ferred payout on the other option.  The sum of the big payout ($83,602,183) and

[*54] the small payout ($420,160) was $84,022,343. That sum almost exactly equaled the sum of the two option premiums ($41,994,000 × 2 = $83,988,000), with the difference ($34,343) attributable to interest.

Ignoring interest, the option payouts equaled the option premiums, so the roll funds could not possibly profit from their supposed bet on the exchange rate between the euro and the British pound. However, because the roll funds kept their books in U.S. dollars, and because the option payouts were to be made in euro and kroner, there existed a theoretical risk--and correlative potential for profit--in the event of exchange rate swings among those currencies and the dollar during the seven-day option period. But that risk was eliminated when Delta and Deutsche Bank fixed the applicable exchange rates in advance.

The trade summary spreadsheets exchanged between Delta and Deutsche Bank when executing block trade A (and all the other option trades) included the seven-day forward rates for the euro versus the krone, for the dollar versus the euro, and for the dollar versus the krone. When Deutsche Bank settled the option trades seven days later, it calculated the payouts using those pre-agreed forward rates. Because the roll funds knew in advance how many dollars they would receive when the trades closed, they bore no foreign exchange risk and had no possibility of making any foreign exchange profit.

**[\*55]**  At trial Mr. Beer admitted that Deutsche Bank had settled the option trades using the seven-day forward rates for the euro and krone reflected in the trade summary spreadsheets, rather than the spot rates prevailing when the trades closed.  For this he blamed Deutsche Bank's trading desk, alleging that it had incorrectly used the forward, rather than the spot, rates to convert the payouts.  This testimony was self-serving, and we did not find it credible.

Mr. Beer's testimony presupposes that Deutsche Bank erred in this way, not once, but every time it closed a Delta options trade.  He could not explain why seven-day forward rates would have been included in the term sheets to begin with, unless as part of an agreement to fix the settlement exchange rates in advance.  In any event, the most logical witness to testify about Deutsche Bank's trading practices would have been a witness from Deutsche Bank.  Petitioners did not call anyone from Deutsche Bank to testify, and from this we infer that such testimony would not have been helpful to them.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).

For these reasons we find that the paired foreign currency options had no reasonable possibility of generating an economic profit.  See Horn, 968 F.2d at 1237.  Because the put and the call had precisely offsetting payout conditions, the

**[*56]** roll funds could not possibly profit on the bet concerning the future exchange rate between the euro and the British pound. And because Delta and Deutsche Bank fixed in advance the exchange rates at which the euro and krone payouts would be converted into dollars, the roll funds could not possibly profit from exchange-rate swings during the seven-day option period. Ignoring nominal amounts of interest, the big payout on the winning option plus the small payout on the losing option equaled the sum of the two option premiums. The big payout repaid Deutsche Bank for the loan used to fund the option premiums. And the small payout returned to the roll funds the cash they put up initially. When the dust cleared, the roll funds simply made a bank deposit and got their money back one year later, with interest at LIBOR as agreed in advance.

2.    Subjective Business Purpose

Having found that the transactions could not have produced a profit, we turn to Horn's second prong: whether the participants, in a subjective sense, had a business purpose apart from generating tax losses. Factors relevant to this inquiry include: (1) aspects of a transaction's structure, content, or pricing that are inexplicable absent a tax-avoidance purpose, CM Holdings, Inc., 301 F.3d at 107;  (2) the extent to which the taxpayer evaluated the transaction's risks and profit potential, IES Indus., Inc., 253 F.3d at 355; Rice's Toyota World, Inc., 752 F.2d at 92-93;

[*57] (3) how the transaction was marketed to investors, Pasternak v. Commissioner, 990 F.2d 893, 901-902 (6th Cir. 1993), aff'g T.C. Memo. 1991-181; and (4) whether the transaction was conducted at arm's length, Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 568 (1991). Since the roll funds were partnerships, we also consider whether "the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." See ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 513 (D.C. Cir. 2000) (noting that the "sham partnership" and "economic substance" doctrines overlap in this context), aff'g T.C. Memo. 1998-305.

The roll funds were outgrowths of POPS and PICO transactions that were marketed to investors as tax shelters. Mr. Beer designed the roll funds to preserve for later years illegitimate tax-shelter losses that POPS investors could not use currently. Once that objective was achieved, he repurposed the roll funds to shelter gains that he and his Bricolage affiliates had themselves realized from their tax-shelter schemes. The roll funds and the POPS transactions from which they grew were clearly "marketed as tax shelters whose promised tax-savings guaranteed economic gain to the participants." Pasternak, 990 F.2d at 901-902; Buyuk LLC v. Commissioner, T.C. Memo. 2013-253, 106 T.C.M. (CCH) 502, 522 (finding a

[*58] lack of subjective business purpose where transaction "was marketed as a tax shelter").

There is no evidence that the participants in Alligator, Cabrini, Endeavor, or Satellite "intended to join together as partners to conduct business activity for a purpose other than tax avoidance." ASA Investerings P'ship, 201 F.3d at 513. The four roll funds were paper entities that engaged in no business activity whatever; Delta executed the block trades and simply assigned percentages of the losses to each partnership. None of the POPS investors for whose benefit the losses were initially created testified at trial, and there is no evidence that they even knew what was going on.

Bricolage computed its fees for the underlying POPS transactions as a percentage of the tax losses that investors desired. Although it charged no additional fee for rolling those losses forward, each investor's initial contribution to his roll fund represented a fraction of the losses he wished to secure in 2001. See supra pp. 14-17. This form of pricing suggests a tax-avoidance purpose. See Buyuk LLC, 106 T.C.M. (CCH) at 521 (finding a lack of subjective business purpose where amounts the taxpayers committed to invest "were determined solely as percentages of the anticipated tax losses").

[*59] The structure and content of the paired foreign currency options also shows the lack of a subjective business purpose. Petitioners insist that the transactions were intended to profit if Denmark lifted the krone's peg to the euro. Such a de-peg was extremely unlikely. Assuming arguendo that one wished to place this long-shot bet, one would be ill-advised to select an option period of just seven days. And even if a depeg occurred during those seven days, the roll funds could not have profited because the parties had agreed in advance that the option pay-outs would be calculated, not using the spot rates prevailing at settlement, but us-ing the seven-day forward rates for the krone versus the euro.

If Delta truly wished to bet on a krone depeg, it had straightforward invest-ment tools available to it, e.g., engaging in foreign exchange swaps, purchasing krone puts, or selling the currency short. The transactions it actually implemented were (to say the least) overly elaborate. See Boca Investerings P'ship v. United States, 314 F.3d 625, 632 (D.C. Cir. 2003) (noting that purported partners could have avoided millions of dollars in transaction costs by purchasing notes directly instead of creating an elaborate structure); ASA Investerings P'ship, 201 F.3d at 516 (finding a lack of subjective business purpose where taxpayer could have placed its economic bet without "use of the elaborate partnership-with a pair of partners concocted for the occasion"); Bank of N.Y. Mellon Corp. v. Commission-

[*60] er, 140 T.C. 15, 38-39 (2013) (finding lack of subjective business purpose where tax-shelter participants could have achieved purported business objective by simply signing a loan agreement and a security agreement), aff'd, 801 F.3d 104 (2d Cir. 2015); Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 186-187 (D. Conn. 2004) ("[T]he construction of an elaborate, time consuming, inefficient and expensive transaction * * * for the purported purpose of generating fees itself points to * * * [plaintiff's] true motivation, tax avoidance."), aff'd, 150 F. App'x 40 (2d Cir. 2005).

Despite the euro/krone peg, petitioners insist that the roll funds could have realized foreign-exchange profit or loss depending on currency moves between those currencies and the dollar. As noted previously, however, the trade summary spreadsheets exchanged between Delta and Deutsche Bank also included the seven-day forward rates for the dollar versus the euro and the dollar versus the krone. Deutsche Bank in fact used these pre-agreed forward rates when converting the option payouts into dollars. Indeed, although the roll funds executed numerous foreign currency option trades at various times over the course of two years, none of them ever recorded a single dollar of foreign exchange gain or loss. This would seem inconceivable if they truly faced currency fluctuation risks. This track record clearly shows that the exchange rates were all fixed in

[*61] advance, that the option trades were effectively executed in dollar terms, and that the roll funds thus bore no foreign-exchange risk of any kind.

Petitioners suggest that we should not examine the investors' motivations for entering into the paired foreign currency options, but instead consider whether Bricolage intended to profit from selling tax shelters to consumers. According to petitioners, Bricolage intended to repurpose the roll funds into less exotic investment vehicles after the loss legs of the December 2000 trades were terminated. Bricolage allegedly intended to market the repurposed partnerships to wealthy investors, who would supposedly find the funds' "trading history" and built-in losses attractive. Bricolage contends that this plan was derailed when IRS announced its intention to challenge POPS and PICO transactions.

This contention is wholly unpersuasive. To start with, petitioners' factual assertions find no support in the record. Apart from Mr. Beer's testimony, which we did not find credible, there is no evidence that Bricolage ever intended to repurpose Alligator, Cabrini, Endeavor, or Satellite into conventional investment vehicles. These roll funds were designed for a limited purpose: transferring POPS losses from 2000 to 2001. After accomplishing this objective, Bricolage purchased the investors' interests in the roll funds so that it could reduce its and Mr. Beer's own tax liabilities. The roll funds had no "trading history" that could ap-

[*62] peal to investors; they were paper entities that had a handful of losses assigned to them. In any event, "the desire to aid another party in tax avoidance is no more a business purpose than actually engaging in tax avoidance." ASA Investerings P'ship, 201 F.3d at 513-514 n.6.

On the whole we find petitioners' entire line of argument misdirected. That Bricolage intended to profit from the tax-shelter schemes is undisputed; it would not have created these Rube Goldbergesque structures without receiving very large fees. But the question we must answer is whether the parties to the roll fund transactions had a business purpose apart from generating tax losses. See Rice's Toyota World, Inc., 752 F.2d at 92. By creating a structure with precisely offsetting option payout terms and settlement exchange rates fixed in advance, Bricolage and Deutsche Bank ensured that the roll funds could not possibly enjoy an economic profit. By intentionally eliminating any possibility of profit, Bricolage demonstrated that it had no business purpose apart from generating tax losses, first for the POPS investors and then for itself and Mr. Beer.

In form the roll fund transactions generated hundreds of millions of dollars of purported losses. But in substance they merely circulated cash between the partnerships and Deutsche Bank according to a series of prearranged steps. See Bank of N.Y. Mellon Corp., 140 T.C. at 36-37. These transactions could not have

**[\*63]** produced a profit and were not animated by any business purpose apart from tax avoidance. Finding as we do that the transactions lacked economic substance, we will sustain respondent's disallowance of the loss deductions claimed by the roll fund partnerships.

D.    Accuracy-Related Penalties

In each FPAA respondent asserted accuracy-related penalties under section 6662(a). Section 6751(b) provides:

> No penalty under this title shall be assessed unless the initial de-termination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

We recently held that a taxpayer challenging an accuracy-related penalty may properly raise, in a pre-assessment posture, respondent's alleged noncompli-ance with the supervisory-approval requirement of section 6751(b). See Graev, 149 T.C. at __ (slip op. at 5). Although that was a deficiency case involving taxation of individuals, the logic of our Opinion applies equally to a TEFRA case such as this. When a penalty is asserted in a notice of deficiency or in an FPAA, the Commissioner must secure supervisory approval for the penalty before issuing that notice to the taxpayer. See Chai, 851 F.3d at 221-222.

**[*64]** In <u>Dynamo Holdings Ltd. P'Ship v. Commissioner</u>, 150 T.C. __, __ (slip op. at 16-17) (May 7, 2018), we held that the Commissioner has no burden of production under section 7491(c) with respect to a penalty asserted against a partnership. <u>See</u> sec. 7491(c)(1) (placing burden of production on the Secretary with respect to the liability "of any individual" for any penalty). Thus, in a TEFRA partnership proceeding such as this, respondent has no burden of production under section 7491(c)(1), and petitioners have the burden of proving that no penalty should apply. <u>See</u> Rule 142(a); <u>Welch</u>, 290 U.S. at 115; <u>NT, Inc. v. Commissioner</u>, 126 T.C. 191, 194-195 (2006); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001).

Following the completion of post-trial briefing, we granted petitioners' motion to amend their pleadings to assert, as a defense to the accuracy-related penalties, respondent's alleged lack of compliance with section 6751(b). We invited respondent to file a motion to reopen the record to submit evidence on this point, but he declined to do so, stating: "Respondent does not have the written approval of either the immediate supervisor of the individual who made the initial determination to assert an accuracy-related penalty * * * [or of] a higher level official designated by the Secretary."

**[\*65]** Section "6751(b)(1) requires written approval of [an] initial penalty determination no later than the date the IRS issues the notice of deficiency (or files an answer or amended answer) asserting such penalty." Chai, 851 F.3d at 221. In the instant cases, the initial penalty determinations were set forth in the FPAAs, and respondent has conceded that the IRS did not secure written supervisory approval of the penalties before those notices were issued to petitioners. In light of petitioners' having properly raised this issue and respondent's concession, we find that the IRS did not comply with section 6751(b).

Respondent contends that he satisfied the requirements of section 6751(b) by amending his answers to reassert the accuracy-related penalties and by securing supervisory approval for those amendments. We are unable to accept this argument. Section 6751(b) requires written supervisory approval for the "initial determination" of a penalty assessment. In the instant cases the "initial determination" of the accuracy-related penalties was made before the date on which those penalties were included in the FPAAs. Because the requisite supervisory approval was not secured at that time, the IRS did not comply with the statutory requirement.

Allowing respondent to cure an admitted violation of section 6751(b) by reasserting penalties in an amended pleading would frustrate Congress' purpose in enacting this statute. See S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537

**[\*66]** (expressing Congress' belief "that penalties should only be imposed where appropriate and not as a bargaining chip"); <u>Chai</u>, 851 F.3d at 219 (noting that Congress intended to "prevent IRS agents from threatening unjustified penalties to encourage taxpayers to settle"). The accuracy-related penalties determined by the IRS therefore are not sustained.

To reflect the foregoing,

<u>Appropriate decisions will be entered</u>.